UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CROTTY



---------------------------------------------------------------x

Ilya Eric Kolchinsky,

          *Plaintiff,*

-against-

Moody's Corporation, Moody's Investors Service, Inc.
and Raymond McDaniel,

          *Defendants.*

---------------------------------------------------------------x

Index No. 10 CV 6840

**COMPLAINT**

Civ. Action No.

JURY TRIAL

Plaintiff Ilya Eric Kolchinsky, by his attorneys, Malecki Law, for his Complaint, hereby states as follows:

## I.    Background and Parties

1. This is an action against Moody's Corporation and Moody's Investors Service, Inc. (collectively referred to as "Moody's") and Raymond McDaniel ("McDaniel") by a former employee for defamation, injurious falsehoods and tortious interference with business relationships.

2. Plaintiff Ilya Eric Kolchinsky ("Mr. Kolchinsky") is a citizen of the State of New Jersey and a resident of Union County. He worked at Moody's until mid September 2009, after which, Mr. Kolchinsky was invited to testify in front of the House Committee on Oversight and Government Reform (the "House Committee"). Prior to and following his truthful, solicited testimony before the House Committee, Moody's embarked on a carefully planned media campaign to discredit Mr. Kolchinsky, and impugn his integrity, honesty, work and abilities. Prior to that negative media campaign, Mr. Kolchinsky was highly regarded in the securities industry, with a good reputation for honesty, ability and integrity. He had never been substantially unemployed prior to the events at issue in this case, but since Moody's defamatory statements, he has, in effect, been black-listed by the private sector financial industry.

3. Defendant Moody's Corporation is the parent of Moody's Investors Service, a Nationally Recognized Statistical Rating Organization ("NRSRO"). Upon information and belief, Moody's is a Delaware corporation with its principal place of business in New York.

4. Defendant Moody's Investors Service, Inc. is a subsidiary of Moody's Corporation. Upon information and belief, Moody's Investors Service is a Delaware corporation with its principal place of business in New York.

5. Defendant Raymond McDaniel was, at all relevant times, the Chief Executive Officer and the Chairman of the Board of Moody's Corporation as well as the President of the Moody's Investors Service subsidiary. Upon information and belief, Mr. McDaniel is a resident of the State of New York and works at the Moody's offices located at 250 Greenwich Street, New York, NY.

6. The NRSRO designation is given by the government to companies which the government believes can properly be relied upon by investors and fiduciaries as a source for honest and independent credit opinions. NRSROs are regulated in the United States by the Securities and Exchange Commission

> ...[R]ecently enacted legislation amended the Exchange Act to require NRSROs to "establish, maintain, enforce, and document an effective internal control structure governing the implementation of and adherence to policies, procedures, and methodologies for determining credit ratings." Dodd-Frank Act, § 932(a)(2)(B) (to be codified at 15 U.S.C. § 78o-7(c)(3)).[1]

7. Regulators and investors alike rely on the honesty and the integrity of the rating agency managers to ensure the stability of the financial system. As the facts of this case will show, Moody's repeatedly made false and misleading public statements about Mr. Kolchinsky in order to discredit his testimony. These false statements were made by senior managers, including Mr. McDaniel, who are responsible for establishing and enforcing an effective internal control structure at Moody's.

## II. Jurisdiction and Venue

8. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiff is a resident of a different state than Defendants Moody's and McDaniel.

9. Venue in this district is proper pursuant proper to 28 U.S.C. § 1391 because a substantial part of the events or omissions which the claim is based occurred in the Southern District of New York.

10. Plaintiff has suffered damages over the jurisdictional minimum requirements.

---

[1] Securities and Exchange Commission: Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: Moody's Investors Service, Inc; http://www.sec.gov/litigation/investreport/34-62802.htm

### III. Statement of Facts

#### A. September 2007 Intervention

11. In September 2007, Mr. Kolchinsky was a Managing Director at Moody's with responsibility for running the US ABS CDOs product line. Mr. Kolchinsky was a senior person charged with enforcing Moody's "highest standards of honesty."

12. Concerned about Moody's committing securities fraud, Mr. Kolchinsky reported his concerns to his manager. His manager was non-responsive, so Mr. Kolchinsky escalated his concerns, as would be proper in this situation.

13. Mr. Kolchinsky spoke with a more senior manager, Andrew Kimball, and, as a result of Mr. Kolchinsky's intervention (the "September 2007 Intervention"), the potentially fraudulent situation was addressed. Moody's acknowledged publicly and in private emails that the September 2007 Intervention prevented a problem. Nonetheless, Mr. Kolchinsky was retaliated against and removed from his position at the rating agency.

#### B. Summer 2008 Reporting

14. In the summer of 2008, Mr. Kolchinsky became aware that his former group was preparing to resume rating one of the most toxic products of the recent U.S. financial crisis era – the ABS CDO. These products were responsible for hundreds of billions of losses at financial institutions like AIG, Merrill Lynch and Citigroup.

15. Mr. Kolchinsky filed a complaint with the Moody's compliance group regarding the September 2007 Intervention, referencing the then current problem, and retained counsel to assist him in dealing with Moody's ("2008 Complaint").

16. Mounting pressure from lawmakers and regulators caused Moody's to set up an internal credit policy structure nominally independent of the lines of business. In October 2008, Mr. Kolchinsky was asked by that group to render an opinion on aspects of the new methodology being promoted by Mr. Kolchinsky's former group, as detailed above.

17. In a series of emails (the "Credit Policy emails") with members of the credit policy team, as well as the head of structured finance, Mr. Kolchinsky laid out detailed objections to the new methodology. He concluded that the methodology was "irresponsible."

18. At the time Mr. Kolchinsky filed his 2008 Complaint with the compliance group, Michael Kanef ("Kanef") was the Chief Regulatory and Compliance Officer for Moody's Investors Service. Mr. Kanef personally took the lead in investigating Mr. Kolchinsky's allegations.

19. Prior to his role in compliance, Mr. Kanef was the head of the group which rated residential mortgage backed securities, including those backed by subprime mortgages. He was the key manager driving Moody's policies in that area. During the September 2007 Intervention, Mr. Kanef was deeply involved in the decision-making on downgrades of the securities, which caused Mr. Kolchinsky to worry about ratings on his own deals.

20. At the time Mr. Kolchinsky filed his complaint, Mr. Kanef was a named defendant in a shareholder lawsuit against Moody's related to the ratings of the same securities at the core of the September 2007 Intervention (the "Shareholder Lawsuit"). The conflicts of interest inherent in the selection of this manager to conduct the investigation was or should have been obvious.

21. Two follow up meetings took place between Mr. Kolchinsky and Mr. Kanef relating to his 2008 Complaint. During the first meeting, after extolling the thoroughness of his conflicted investigation, Mr. Kanef admitted that he was unaware of certain key facts and that he had not interviewed a key witness. He asked for additional time. A substantial amount of time during the first meeting was spent discussing Mr. Kanef's own role in the September 2007 Intervention.

22. During the second meeting, Mr. Kanef announced that he referred the matter to Sullivan & Cromwell, Moody's retained outside counsel. The attorney performing the work was also the lead counsel in representing Mr. Kanef and Moody's in the Shareholder Lawsuit.

23. Sullivan & Cromwell affirmatively and specifically asked Mr. Kolchinsky to report any potential violations of the law and Moody's policies that he was or became aware of, resulting in his sending four emails in January 2009 (the "January Emails"). The concerns expressed in the emails paralleled the Credit Policy emails and focused on prevention of further violations similar to the September 2007 Intervention.

24. In May 2009, Mr. Kolchinsky noticed a press release for a transaction called Nine Grade Funding II ("NGFII"). It had only been recently rated and was already being placed for watch on downgrade. This immediate change of fortune indicated to Mr. Kolchinsky that something had gone wrong with the initial rating of the transaction.

25. Mr. Kolchinsky's inquiry indicated that the facts around NGFII were identical to those in the September 2007 Intervention. Although on the verge of making a new ratings methodology public, the group rated NGFII using information it knew was no longer correct. The change in methodology effectively downgraded a whole group of ratings. However, for the purposes of rating NGFII, Moody's used the old, incorrect ratings.

26. Mr. Kolchinsky was no longer a part of the rating agency and was not involved in the rating of NGFII; however, as he had been asked to report on such issues by Moody's counsel, he wrote a highly detailed memo, backed by memoranda, files and emails (the "NGFII Memo"). The NGFII Memo drew the conclusion that NGFII was a violation of US securities laws. The NGFII Memo was given to Mr. Kanef in July of 2009.

27. Immediately after receiving the NGFII Memo, Moody's hired law firm Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") to represent Moody's in an internal investigation and related matters. The legal team included an attorney of whom the firm boasted on its website as "regularly represent[ing] and advis[ing] clients in employment litigations, including disputes concerning ... retaliation, whisteblowing...".

28. Mr. Kolchinsky agreed to cooperate with the investigation by Moody's and to meet with Kramer Levin to discuss NGFII on September 2, 2009. However, Mr. Kolchinsky had concerns and wanted counsel present, particularly because:

    a. the specialization of the lawyers hired by Moody's did not include any experience with CDOs, ratings or structured finance;
    b. Mr. Kolchinsky had no personal knowledge of the matter and had not rated the security, so everything he knew about NGFII was in the NGFII Memo;
    c. Moody's allowed a subsequent, questionable substitution within the NGFII rating even after receiving the NGFII Memo that revealed the ratings and procedures to be faulty;
    d. Kramer Levin refused to speak to Mr. Kolchinsky's attorney directly; and
    e. Just before the meeting, Kramer Levin refused to send Mr. Kolchinsky a previously agreed upon agenda for the meeting (which he intended to share with his attorney), refusing to commit anything to writing.

Because of the prior retaliatory actions taken by Moody's against him, Mr. Kolchinsky wanted his attorney to be a part of any meeting with Kramer Levin. His attorney had previously been involved in discussions between Mr. Kolchinsky and Moody's and no prohibition of attorney involvement was raised. However, without an agenda to prepare for the meeting with his counsel, Mr. Kolchinsky postponed the meeting in order to protect himself and his rights.

29. On September 3, 2009, Mr. Kolchinsky was called into the offices of Marianne Fabozzi, a human resources manager for Moody's. They were joined by Ms. Amy Winkelman, an assistant general counsel. The meeting was recorded by Mr. Kolchinsky. He was given an ultimatum of either speaking with a Kramer Levin attorney immediately or being suspended, despite Mr. Kolchinsky's protestations that he was represented by an attorney and wanted her involved in the meeting.

30. Mr. Kolchinsky's employment with Moody's ended on September 15, 2009. Moody's retaliation against Mr. Kolchinsky is the subject of a Department of Labor investigation and not an issue in this suit, but the underlying background information is relevant to the defamation and other claims.

31. As a direct result of his suspension, Mr. Kolchinsky was asked to testify in front of the House Committee on Oversight and Government Reform. The Wall Street Journal ran a story about the House hearings on September 24th, 2009, entitled "Congress Takes On Credit Ratings".

### C. Moody's Intentional, Malicious And Tortious Conduct To Discredit Mr. Kolchinsky Publicly

32. Incapable of challenging Mr. Kolchinsky's facts and legal conclusions on the merits, Moody's chose to attack and discredit Mr. Kolchinsky, yet Moody's did not dispute any of the statements in Mr. Kolchinsky's NGFII Memo.

33. Instead, Moody's repeatedly and publicly published falsehoods about Mr. Kolchinsky, the tone and purpose of which was to cast dispersions on his credibility as a "whistleblower" and to disgrace and ridicule his work and reports, i.e., to make it appear that he was unfit for his profession as an analyst. Moody's claims were intended to make Mr. Kolchinsky seem like an unprofessional, disgruntled employee who files false claims and performs faulty analysis, based on unmeritorious statements.

34. False statements by Moody's fell into three broad categories:

   a. **Unsupported claims.** Moody's also repeatedly claimed that Mr. Kolchinsky's "evolving" reports about the firm's actions were "unsupported" or "lacked merit". To undercut Mr. Kolchinsky's credibility and portray him as disgruntled, potentially unstable and unprofessional, Moody's crafted a false story to address issues Mr. Kolchinsky brought to light internally and for which he was called to testify before Congress. Additionally, these statements portrayed Mr. Kolchinsky's reports and statements therein as not credible because they were changing. While there were separate reports, the thrust and the themes of the reports were constant and unwavering. In fact, Moody's own statements and actions following his reports show that Mr. Kolchinsky's claims in fact had merit; and in the case of a number of his policy suggestions, were adopted by Moody's.

   b. **Failed to Cooperate.** Mr. Kolchinsky never refused to cooperate in any investigation of the reporting of misconduct that he made. However, Moody's claimed that Mr. Kolchinsky failed to cooperate in the investigation of his own allegations, as well as maliciously and purposefully allowed publication of a false and misleading termination letter in the public records, as described below. These statements were meant to reinforce an image of Mr. Kolchinsky as disgruntled, uncooperative and unprofessional. The truth is that Mr. Kolchinsky was eager to cooperate with the investigation and simply wanted counsel present.[2]

   c. **Independent investigation.** Moody's repeatedly claimed that an independent investigation cleared it of any wrongdoing related to the misdeeds highlighted by Mr. Kolchinsky. The claim directly attacked the credibility and the judgment of Mr. Kolchinsky. However, there is no evidence that it was an independent investigation, just the opposite. The relationship between Moody's and investigating law firm (Kramer, Levin) was that of client and defense advocate.

---

[2] An example of Moody's propensity for falsehoods can be seen even in the papers it submitted to the House Committee. The memo was released to the public and fabricated the events surrounding Mr. Kolchinsky termination. It is contained at pp. 197/201 of the House Committee hearing materials. In it, Ms Fabozzi states that "[m]oreover, at no time did you advise Moody's that your refusal to meet with Kramer Levin was because you wanted your lawyer present." However, Mr. Kolchinsky can be clearly heard saying at the September 3rd meeting: "I have counsel, we've had employment issues here..." as the reason for rejecting a demand that he speak to a Kramer Levin attorney.

7

35. The combination of these claims sought to portray Mr. Kolchinsky as a disgruntled employee, bitter at the company and willing to go to any length to get his way. These false statements have caused great damage to Mr. Kolchinsky's professional reputation and have "black-listed" Mr. Kolchinsky in the private sector on Wall Street.

36. In reality, Mr. Kolchinsky spent an enormous amount of time and effort in making sure that the NGFII Memo was accurate, fair and backed by documentation. Congressional and government investigators who have had the opportunity to subpoena the extensive documents backing up his claims have repeatedly asked Mr. Kolchinsky to testify in public and private settings.

37. Mr. Kolchinsky has been unable to effectively publicly defend himself against these false claims because of his ethical obligations not to publicly distribute material which may have Moody's confidential information.

### D. "Unsupported" and "Evolving" Claims

38. Mr. Kolchinsky was invited to testify before the House Committee in its investigation of the rating agencies, including Moody's, where he testified honestly and to the best of his ability.

39. Prior to and following Mr. Kolchinsky's solicited testimony, Moody's used the press as a tool to spin a story contrary to the testimony and stated as fact that Mr. Kolchinsky has made "unsupported" and "evolving" claims about Moody's.

40. According to Moody's, **all** of these claims were unsupported by the facts, leaving the reader with the distinct impression that Mr. Kolchinsky was changing his story and being untruthful, i.e. someone who is unfit for his profession as an analyst. There was nothing farther from the truth.

41. The following statement appeared in the Wall Street Journal, a periodical which is widely read among Mr. Kolchinsky's peers:

> A Moody's spokesman says that ... Mr. Kolchinsky 'has made an evolving series of claims of misconduct within the company and we have conducted multiple separate reviews." In each case, Moody's "found that his claims were unsupported,'

"Congress Takes On Credit Ratings" September 24, 2009, The Wall Street Journal; ("September 24 WSJ Story") [Emphasis added].

42. In a story which ran on the Bloomberg terminals and read by Mr. Kolchinsky's peers and potential employers, Moody's stated:

> 'Moody's takes seriously all allegations of potential impropriety... We have conducted reviews of Mr. Kolchinsky's claims as they have been reported to the company. <u>In each case Moody's found the claims were unsupported.</u>'

"Moody's Probes New Kolchinsky Claims, Says Old Ones Unfounded", September 25, 2009; (the "Bloomberg story") [Emphasis added].

43. In another Wall Street Journal story appearing the same day:

> 'The [Moody's] spokesman said Mr. Kolchinsky's previous claims were found by Moody's to be unsupported.'

"Raters Face Fresh Push In House Over Claims", September 25, 2009; The Wall Street Journal.

44. During the Q3 Call on October 29, 2009, Mr. McDaniel proceeded to claim:

> 'The [Kramer Levin] investigators found that [Mr. Kolchinsky's] allegations <u>were not supported by the facts and were without merit</u>. In fact the investigators specifically concluded that in every instance Moody's employees acted according to established policies and procedures.'

[Emphasis added].

45. These statements were false as Moody's demonstrated with its own words and actions. Moody's adopted policy recommendations made by Mr. Kolchinsky and has admitted the same.

46. At the House Committee hearings, Moody's admitted that, contrary to their statements to the press, at least one of Mr. Kolchinsky's claims reported to the company had merit. During the questioning by Representative Jason Chaffetz, a Moody's representative Mr. Richard Cantor (Moody's chief risk officer), was forced to concede, under oath, that Moody's adopted Mr. Kolchinsky's concerns:

> **Mr. Chaffetz.** Did Moody's eventually adopt Mr. Kolchinsky's recommended policy after his transfer?

9

> **Mr. Cantor.** I know there was a policy recommendation made before, I am not sure when it was. Before or after his transfer, he made one policy recommendation that was communicated I think to Compliance, maybe to others. <u>It was carefully considered and it was adopted, yes.</u>
>
> **Mr. Chaffetz.** So it was.
>
> **Mr. Cantor.** Yes.

[Emphasis added].

47. Yet even after this admission, Moody's continued its high-profile, malicious, negligent and/or reckless press campaign, claiming that Mr. Kolchinsky's "allegations were not supported by the facts and were without merit."

48. The main thrust of Mr. Kolchinsky's January 2009 reporting emails to the compliance group involved the legal and credit propriety of assigning ratings based on other ratings, which the rating agency knew were constantly and relentlessly changing.

49. In fact, the recommendations made by Mr. Kolchinsky in the January emails to Mr. Kanef were later adopted by Moody's in their official methodologies.

    Excerpt from January 9, 2009 email:

    > The default probability stress is completely inadequate. For example, the default probability stress for mortgage-backed Aaa will be 12 times. This places the Aaa at slightly below Aa1<u>. How can you assign ratings based on this stress when the RMBS group has routinely downgraded Aaa multiple categories ... in one action? The new CDO ratings based on this stress will not be sufficient.</u>

    [Emphasis added].

50. Excerpt from January 13, 2009 email:

    > Given the broad deterioration in credit quality across all asset classes, multiple pools can be constructed this way ... Moreover, one of the benefits of going with the "re-rating" method is that it reduces 10b-5 liability for Moody's.... This potential liability stems from <u>the severe and dramatic downgrades we are still seeing in the ABS world</u> and is identical to the one I described in my complaint. The re-rating process would help in making sure that any new derivative ratings do not knowingly misrepresent Moody's

own evaluation of a security.

[Emphasis added].

51. A few months after the above emails, Moody's issued an official methodology for rating CDOs backed other structured assets, which adopted Mr. Kolchinsky's suggestions. From "Moody's Approach to Rating SF CDOs," March 2, 2009, posted on Moody's website[3]:

> In general, for SF assets rated by Moody's, the rating used in the analysis will be the current published rating adjusted for watch status ...
>
> However, in a volatile credit environment where large and widespread rating downgrades within certain sectors may be common, Moody's rating analysts work closely with relevant Moody's rating teams (such as RMBS, CMBS, ABS, etc.) to assess the credit quality of underlying assets in SF CDOs portfolio. The information provided can reflect certain updates and loss projections which may have a significant impact on the future ratings of the underlying SF assets. If deemed necessary following an in-depth review of the assets, the ratings used in the analysis may be adjusted to reflect this information.

[Emphasis added].

52. Moody's followed Mr. Kolchinsky's advice in adjusting the public ratings for certain securities due to the market and rating volatility. Unfortunately, Moody's failed to follow even this published methodology in the rating of the Nine Grade Funding II.

53. In addition, the falsity of the claim that Mr. Kolchinsky's claims were "evolving" is disputed by documentary evidence as well as recordings of conversations between Mr. Kolchinsky and the various Moody's personnel involved in the process.

54. Mr. Kolchinsky's claims were in fact meritorious and adopted by management. In addition to the examples cited above, Plaintiff believes that Moody's adopted other recommendations. For example, upon information and belief, Moody's stopped rating ABS CDOs in response to Mr. Kolchinsky's complaint.

---

[3] The document was re-issued in August 2009.

### E. "Failed to Cooperate"

55. To reinforce the image of Mr. Kolchinsky as a volatile and unprofessional employee whose word should not to be trusted, Moody's has also claimed that he failed to cooperate in the investigation which his NGFII Memo initiated.

56. From the McClatchy Q&A:

    Those [Kramer Levin] investigating lawyers have been given unfettered access to Moody's personnel and documents. Indeed, <u>the only person who has declined to cooperate with the independent investigation is Mr. Kolchinsky.</u>

    [Emphasis added].

57. From the September 24 WSJ Story:

    The [Moody's] spokesman said Mr. Kolchinsky "<u>refused to cooperate with an investigation</u>" into the issues he raised...

    [Emphasis added].

58. Mr. Kolchinsky's cooperation began when he submitted a 13-page highly detailed memorandum containing not only the factual details of the misconduct, but a legal discussion of their impact as well. Mr. Kolchinsky had no firsthand knowledge of the events surrounding the acts described in the NGFII Memo. He based his conclusions on Moody's own official records (which remained in Moody's possession) and his considerable understanding of the rating methodologies. The NGFII Memo contained everything that Mr. Kolchinsky knew about the incident.

59. In fact, Mr. Kolchinsky was eager to cooperate with Moody's and Kramer Levin but wanted counsel present.

60. Rule 4.2 of the New York Rules Of Professional Conduct for attorneys states that:

    > In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law."

61. Given the prior retaliatory actions by Moody's against him, Mr. Kolchinsky had a real fear of further reprisals from his employer. From the beginning of his interaction with Kramer Levin, Mr. Kolchinsky communicated to the law firm that he was represented by counsel and that he wanted his counsel involved in the discussions. At no time, did Kramer Levin attempt to speak to Mr. Kolchinsky's attorney and obtain permission from his counsel to communicate with Mr. Kolchinsky outside her presence or request her presence, despite her availability to meet.

62. On September 3, 2009, Mr. Kolchinsky was called to the office of Marianne Fabozzi, a human resources representative. Present also was Amy Winkelman, an Associate General Counsel for Moody's. A recording of that meeting clearly shows that Mr. Kolchinsky was given an ultimatum of either speaking to a Kramer Levin partner at that very moment or being suspended. The ultimatum was repeated even after Mr. Kolchinsky reminded the Moody's representatives that he was represented by counsel and that he explicitly wanted his counsel involved.

63. Mr. Kolchinsky never refused to cooperate with the investigation.

### F. Public Statement re: the Purported "Independent" Investigation.

64. Moody's has repeatedly used the claim of "independence" of the Kramer Levin investigation to bolster its public allegations against Mr. Kolchinsky. . This purported "independent" investigation was never released publicly to shareholders or otherwise in any form, except in the grossest generalities and in a manner only to discredit the whistleblower.

65. In answering questions posed to it by the McClatchy newspaper chain on October 18th, 2009, Moody's stated:

> Because Mr. Kolchinsky raised questions about Moody's own review of the evolving claims he made, Moody's commissioned an outside law firm to conduct <u>an independent investigation of all</u> of Mr. Kolchinsky's assertions... The preliminary findings of the independent investigators are completely consistent with Moody's own compliance review -- namely, that Mr. Kolchinsky's claims of misconduct are unfounded. <u>Moody's is confident in the integrity of its people and its processes.</u>"

[Emphasis added].

66. During the company's public third quarter 2009 earnings call on October 29, 2009, McDaniel claimed that:

> I would also like to comment briefly on recent allegations made by a couple of former Moody's employees. First, an external investigation conducted by an <u>independent law firm</u> into various claims about CDOs raised by a former employee has now been completed.

[Emphasis added].

67. All of these statements had the effect that of giving readers the impression that Mr. Kolchinsky's claims were scrutinized by an impartial third party who was independently seeking the truth. The truth is that none of these investigations were independent in any way a reasonable listener would perceive independence.

68. According to the preamble to the New York Rules Of Professional Conduct for attorneys:

> The touchstone of the client-lawyer relationship is the lawyer's obligation to assert the client's position under the rules of the adversary system, to maintain the client's confidential information except in limited circumstances, and to act with loyalty during the period of the representation.

69. Moody's hired Kramer Levin to "represent" it in an "internal inquiry"[4]. The engagement letter does not indicate any special relationship that would indicate that the touchstone of the client-lawyer relationship did not bind the two parties. For example, there were no provisions that Kramer Levin would not represent Moody's in any future matter related to the investigation or a waiver of attorney-client privilege. There are no other common indicia of independence, such as being hired by the independent members of the firm's board of directors.[5]

---

[4] http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg111557 51/pdf/CHRG-111hhrg11155751.pdf, p. 203.

[5] Moody's Corporation Board of Directors maintains a standing Audit Committee composed entirely of independent directors. According to its charter, "The Committee shall oversee the Company's compliance program by reviewing: (a) legal and regulatory compliance matters; and (b) the Company's policies and procedures designed to promote compliance with laws, regulations and internal policies and procedures, including the Company's code of conduct." Additionally, "[t]he Committee shall be empowered to

70. Kramer Levin appears to have been hired to represent Moody's and to develop the best possible defense in case of regulatory inquiry. They were hired as a potential defense counsel and an advocate -- the very antithesis of independence. Moody's sought to characterize the relationship as independent in order to defame and discredit Mr. Kolchinsky by casting aspersions on his claims.

71. Additionally, Moody's use of intimidation tactics with Mr. Kolchinsky, as described in the section on cooperation, may have been used with other interviewees and may have tainted the independence of the entire investigation.

72. Likewise, the previous compliance reviews were severely conflicted. Mr. Kanef, the Moody's chief of compliance who personally conducted the compliance review described by Moody's above, was previously the head of the subprime bond rating unit. The ratings issued by this unit have received severe public and government criticism and were of central importance in the September 2007 Intervention which Mr. Kanef was selected to investigate. At the time of the initial internal investigations, Mr. Kanef was a named defendant in a lawsuit related to those same poor subprime ratings.[6]

73. As Scott McCleskey (Moody's former chief of compliance) stated in his Congressional testimony:

> The hiring of structured finance analysts also creates a clear
> conflict of interest issue since, like Michael Kanef, who came from
> structured finance, they could find themselves passing judgment on
> their own former practices in deciding whether to discipline friends
> or former colleagues and potentially their own future managers
> should they return to their previous business units.

74. During a meeting in October 2008 purportedly to discuss the misconduct of the Moody's CDO unit managers during the September 2007 Intervention with Mr. Kolchinsky, Mr. Kanef spent a substantial amount of time defending his own role in the September 2007 Intervention. Mr. Kanef's role as the former head of subprime and his demonstrated concern about his own role in the events being investigated compromised any internal investigations.

---

retain such outside counsel, accountants, or other advisors as it determines appropriate to assist it in the performance of its functions..."

[6] In re Moody's Corporation Securities Litigation, SDNY, DOCKET NUMBER: 07-CV-08375; http://securities.stanford.edu/1038/MCO_01/.

75. The follow-up by the law firm of Sullivan and Cromwell was also conflicted since the partner leading the review represented Mr. Kanef as a named defendant in a lawsuit described above.

76. Evidence will show that none of the investigations by Moody's were independent and, in fact, were hopelessly conflicted. Yet the false statements to the contrary have damaged Mr. Kolchinsky's professional reputation and have caused severe and lasting harm to his ability to find permanent employment in the private sector.

77. None of the statements above were couched as opinion. At best, they were intended as mixed fact and opinion, but stated as fact.

78. Moreover, the reasonable listener would believe that Mr. Kolchinsky's reports were intentionally false, i.e., "unfounded" and done for a malicious purpose, rather than the laudable purpose of helping the company avoid misconduct, which is what Mr. Kolchinsky was attempting to do.

79. Mr. Kolchinsky may not have expected to receive recognition from Moody's, but he certainly did not expect to be placed in public contempt, ridicule, aversion and disgrace for doing what Moody's had asked him to do, i.e., reporting any wrongdoing he was aware of at Moody's specific request, and cooperating with a House Committee.

## CAUSES OF ACTION

### First Cause of Action
### (Defamation)

80. Plaintiff repeats and realleges paragraphs 1 through 79 hereof as if fully set forth herein.

81. As a result of these unprivileged false, malicious and/or scandalous statements, Mr. Kolchinsky, a private individual, has been portrayed in a false light and publicly disgraced and humiliated in statements designed to impugn his credibility, integrity and honesty, has been injured in his goodwill, good name and reputation in the community in which he works. These negligent, reckless and/or knowingly false statements impugn Mr. Kolchinsky's fitness and qualifications to perform his business, trade and profession. Mr. Kolchinsky has sustained severe damages to his present and future business interests and relationships in the securities industry in an amount which cannot readily be ascertained. By virtue of the nature of the defamation, Mr. Kolchinsky is entitled to presumed general damages as well as punitive damages.

82. By virtue of the foregoing improper conduct by Defendant, Mr. Kolchinsky has been, and continues to be irreparably injured, for which he has no adequate remedy at law.

## Second Cause of Action
### (Tortious Interference with Business Relationships and Economic Advantage)

83. Plaintiff repeats and realleges paragraphs 1 through 80 hereof as if fully set forth herein.

84. Defendants knew or had reason to know that the business community in which Mr. Kolchinsky operates is tightly knit and that any damage to reputation or credibility to a member of the community would have severe consequences with regard to that member's actual and prospective business relationships.

85. Defendants negligently, recklessly and/or intentionally defamed Mr. Kolchinsky and put him in a bad and false light knowing it would end his career in the private sector.

86. Defendants disseminated false and defamatory information to the public about Mr. Kolchinsky in an attempt to induce these individuals to avoid business relationships with him.

87. Defendant's ongoing acts of tortious interference constitute transgressions of a continuing nature, for which Plaintiff has been damaged.

88. Unless Defendant is enjoined from further acts of tortious interference, Plaintiff will continue to suffer further damages and irreparable injury, for which they have no adequate remedy at law.

## Third Cause of Action
### (Intentional Infliction of Emotional Distress)

89. Plaintiff repeats and realleges paragraphs 1 through 88 hereof as if fully set forth herein.

90. The conduct described herein constitutes extreme and outrageous conduct intended to cause and actually causing plaintiff severe emotional distress, justifying the imposition of, *inter alia*, compensatory, consequential, punitive and exemplary damages against the defendants.

## Fourth Cause of Action
### (Prima Facie Tort)

91. Plaintiff repeats and realleges paragraphs 1 through 09 hereof as if fully set forth herein.

92. The conduct of defendants described herein constituted the intentional publication of false information designed to harm Mr. Kolchinsky's reputation in his occupation, from which he has now been "black-listed", intended to cause and actually causing plaintiff reputational damage, consequential and special damages, severe emotional distress, justifying the imposition of, *inter alia*, compensatory, consequential, punitive and exemplary damages against the defendants.

## Fifth Cause of Action
### (Injurious Falsehoods)

93. Plaintiff repeats and realleges paragraphs 1 through 92 hereof as if fully set forth herein.

94. The conduct described herein by defendants was an intentional and/or reckless publication of statements recognized or that should have been recognized by Moody's as likely to result in harm to the pecuniary and reputational interests of Mr. Kolchinsky, knowing that the statements were false or in reckless disregard for the truth or falsity. This did constitute extreme and outrageous conduct intended to cause and actually causing plaintiff severe emotional distress, justifying the imposition of, *inter alia*, compensatory, consequential, punitive and exemplary damages against the defendants.

## Sixth Cause of Action
### (Declaratory Judgment)

95. Plaintiff repeats and realleges paragraphs 1 through 94 hereof as if fully set forth herein.

96. Declaratory judgments are a means to establish the respective legal rights of the parties to a justiciable controversy. The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed relation. The point and the purpose of the relief is to declare the respective legal rights of the parties based on a given set of facts, not to declare findings of fact.

97. Declaratory judgment action has been employed as a way to resolve a relatively unique dispute where the plaintiff is unable to find among the traditional kinds of action

98. Based upon the foregoing, Mr. Kolchinsky is entitled to a declaratory judgment that by affirmatively using the media to disparage Mr. Kolchinsky's work in his profession, Moody's has waived any claims of confidentiality and privilege with respect to Mr. Kolchinsky's reporting of wrongdoing during his employment, as specified above, and Moody's purported "independent" investigation of his reports.

99. As there is no adequate remedy at law available to Mr. Kolchinsky as a result of their actions, a declaratory judgment that these documents be made publicly available.

**PRAYER FOR RELIEF**

Wherefore, Ilya Eric Kolchinsky respectfully requests that this Court enter a judgment in its favor against Defendants by:

(a) Judging in favor of Kolchinsky on Causes of Action 1 through 98 and assessing the appropriate compensatory damages in an amount of not less than $15,000,000, plus costs, attorneys' fees, pre and post judgment interest and punitive damages;

(b) declaring that Mr. Kolchinsky's reports and the investigation of his reports be deemed not confidential or privileged;

(c) awarding any other relief that this Court deems just and appropriate.

JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

MALECKI LAW

Jenice L. Malecki, Esq. (2871)
11 Broadway, Suite 715
New York, NY 10004
(212) 943-1233 phone
(212) 943-1238 facsimile

**Attorneys for Ilya Eric Kolchinsky**