UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
ILYA ERIC KOLCHINSKY,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiff,　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　- against -　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
MOODY'S CORPORATION, et al.　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　Defendants.　　　　　　　　　　　　　　　　:
------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 28, 2012

10 Civ. 6840 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

　　　　Plaintiff Ilya Eric Kolchinsky ("Kolchinsky") filed his Second Amended Complaint on May 9, 2011, pursuant to this Court's order of April 14, 2011 granting leave to amend. Kolchinsky reasserts his previous claims for defamation, tortious interference, intentional infliction of emotional distress, and declaratory relief against his former employer, Moody's Corporation and Moody's Investors Service, Inc. ("Moody's"), and Moody's Chairman and CEO, Raymond McDaniel (collectively, "Defendants"). The Second Amended Complaint adds a claim for violation of the anti-retaliation provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A.[1] Defendants' Fed.R.Civ.P. 12(b)(6) motions to dismiss the Second Amended Complaint were fully briefed as of July 15, 2011.[2] For the reasons discussed below, Defendants' motions to dismiss the defamation, tortious interference, intentional infliction of emotional distress, and declaratory relief claims of the Second Amended Complaint are granted and the motion to dismiss the Sarbanes-Oxley claim is denied.

---

[1] On December 1, 2009, Kolchinsky filed a complaint against Moody's with the U.S. Department of Labor ("DOL") pursuant to 18 U.S.C. § 1514A(b)(1)(A) alleging a violation of the Sarbanes-Oxley Act. The DOL did not issue a decision within 180 days, and the delay was not due to any bad faith by Kolchinsky. (Second Am. Compl. ¶ 76.) DOL approved the withdrawal of Kolchinsky's complaint on April 26, 2011. (Id. ¶ 79.) This Court has jurisdiction to hear this claim pursuant to 18 U.S.C. § 1514A(b)(1)(B).
[2] McDaniel filed a separate motion to dismiss incorporating the same arguments set forth in Moody's memorandum of law. (McDaniel Mem. at 3, 7-8.)

1

**BACKGROUND**

In September 2007, Kolchinsky was Managing Director of the Derivatives Group at Moody's,[3] where he oversaw the domestic Asset Backed Securities Collateralized Debt Obligation ("ABS CDO") product line.  (Second Am. Compl. ¶ 28.)  On September 10, 2007, Kolchinsky learned that Moody's was about to rate ABS CDOs using old rating methodologies. Kolchinsky believed that by using these methodologies, Moody's would knowingly be violating the federal securities laws and SEC rules.  (Id. ¶¶ 29-33.)  He reported these concerns to his direct supervisor, and advised that Moody's should stop rating ABS CDOs until new methodologies were imposed.  His supervisor was "non-responsive."  (Id. ¶¶ 31-32, 34.) Kolchinsky then escalated his concerns to Moody's Head of Credit Policy, and on September 21, 2007, a press release was issued establishing new methods for rating the securities.  (Id. ¶¶ 35-36.)

    A.    Alleged Retaliatory Action

Kolchinsky alleges that shortly after September 2007, Moody's took adverse employment actions against him.  He alleges that Moody's, among other things: prevented him from participating in departmental meetings; removed him from the Derivatives Group; decreased his responsibilities and those of his staff; and lowered his base salary and target bonus.  (Id. ¶ 38.) Kolchinsky contends that these actions were in retaliation for his intervention to prevent what he believed were violations of the securities laws.  (Id. ¶ 37.)

A year later, on September 12, 2008, Kolchinsky filed a retaliation complaint with Michael Kanef, Chief Regulatory and Compliance Officer for Moody's Investor Service.  (Id. ¶ 40.)  Kanef investigated Kolchinsky's allegations, but Kanef had conflicts of interest since he

---

[3] Moody's is a Nationally Recognized Statistical Rating Organization ("NRSRO") and is regulated by the Securities and Exchange Commission ("SEC").  The NRSRO designation is issued to companies which the government believes can issue independent credit opinions.  (Second Am. Compl. ¶ 23.)

oversaw the group that rated residential mortgage-backed securities and was involved in setting Moody's ratings policies for those securities. (Id. ¶¶ 42-43.) During a follow-up meeting with Kanef on December 3, 2008, Kanef stated that Moody's retained the law firm of Sullivan & Cromwell LLP ("Sullivan & Cromwell") in connection with Kolchinsky's retaliation complaint and the concerns he raised in September 2007. (Id. ¶ 44(b).) Kolchinksy alleges that Sullivan & Cromwell asked him to report any potential violations of the law and Moody's policies that he was or became aware of. (Id. ¶ 45.)

In October 2008, Kolchinsky was asked by Moody's Credit Policy Group to give an opinion on a new credit rating methodology being promoted by the Derivatives Group for rating ABS CDOs. (Id. ¶ 47.) Kolchinsky concluded that the proposed methodology was "irresponsible," and he conveyed his objections in various emails to the credit policy team. (Id. ¶ 48.) Kolchinsky alleges that as a result of these emails, Moody's retaliated against him further by transferring him to a "support" role without any revenue responsibilities or opportunity for future promotion. (Id. ¶ 50.)

Kolchinsky raised additional red flags in 2009 about what he believed were potential violations of the securities laws at Moody's. On January 9, 10, and 13, 2009, Kolchinsky emailed Kanef (the "January Emails") expressing concerns similar to those he raised in October 2008. (Id. ¶ 52.) Then, in May 2009, Kolchinksy noticed a press release for a transaction called Nine Grade Funding II ("NGFII"), which was being placed for watch on downgrade, shortly after it was rated. (Id. ¶ 54.) Kolchinsky believed that this sudden downgrading indicated that the initial rating of NGFII was likely problematic. (Id.) Kolchinksy alleges that he inquired and learned that when the Derivatives Group rated NGFII, it used an old methodology that it knew was incorrect. When the Derivatives Group subsequently made a new rating methodology

public, the change effectively downgraded the ratings of a group of securities, including NGFII. (Id. ¶ 55.)  Kolchinsky believed that Moody's actions in connection with NGFII violated the federal securities laws and SEC rules, and in July 2009, he sent Kanef a memorandum expressing his concerns (the "NGFII Memo").[4] (Id. ¶¶ 57-58.)

In August 2009, Moody's retained the law firm of Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") to investigate Kolchinsky's claims in the NGFII Memo in order to terminate him and "white-wash" the company's alleged fraud. (Id. ¶¶ 60-61.)  Nonetheless, Kolchinsky agreed to cooperate with this investigation and meet with Kramer Levin on September 2, 2009, but only if the law firm provided a detailed meeting agenda for Kolchinsky to review with his own counsel prior to the meeting. (Id. ¶ 63.)  Kolchinksy alleges that Kramer Levin refused to provide this agenda, and the meeting was postponed. (Id. ¶ 65.)

On September 3, 2009, the day after the meeting was to take place, Kolchinsky met with a human resources manager and an assistant general counsel for Moody's.  Kolchinsky alleges that he was given "an ultimatum of either speaking with a Kramer Levin attorney immediately or being suspended." (Id. ¶ 66.)  In response, Kolchinsky stated that he was represented by an attorney and wanted her involved in the meeting with Kramer Levin. (Id.)  He was suspended by Moody's the same day.  Kolchinsky contends that this suspension was a constructive termination because Moody's removed his name from the external directory; listed him as "inactive" in the internal directory; told him that he would not be doing any work for, or on behalf of, Moody's; and ordered Kolchinsky to return company computers, cell phones, and identification cards. (Id. ¶¶ 67, 157.)  According to Kolchinsky, Moody's took these measures in retaliation "for failing to cooperate with the so-called 'independent investigation' by Kramer Levin." (Id. ¶ 69.) Subsequent to his suspension, Kolchinsky was asked to testify before the House Committee on

---

[4] Kolchinsky alleges that he wrote the NGFII Memo "pursuant to the instructions of Sullivan & Cromwell." (Id.)

4

Oversight and Government Reform during its investigation of credit rating agencies in September 2009.  (Id. ¶¶ 80, 90.)

  B. Alleged Defamatory Statements

Kolchinsky alleges that in retaliation for reporting what he believed were potential illegal activities at Moody's, the company published "retaliatory falsehoods, omissions and distortions" in order to attack his credibility as a whistleblower and to "disgrace and ridicule his work and reports." (Second Am. Compl. ¶¶ 82-83.)  He asserts that these allegedly retaliatory statements fell into three categories: (1) that Kolchinsky's claims were unsupported and lacked merit; (2) that Kolchinsky failed to cooperate with Moody's in the investigation of his own claims; and (3) that the allegedly independent internal investigation by Kramer Levin cleared Moody's of any wrongdoing.  (Id. ¶ 86 (b)-(c).)

  1. Unsupported Claims

Kolchinsky alleges that before and after his Congressional testimony, Moody's issued press statements suggesting that Kolchinsky's claims and recommendations were "unsupported" by the facts and that his claims were "evolving."[5]  (Id. ¶¶ 91, 96-97.)  To support its contentions, Moody's cited its own independent investigation, but did not release any of its findings.  (Id.)  Kolchinsky claims that because the NGFII Memo was publicly released by the House Committee, Moody's statements disparaged Kolchinsky's analytical ability and professional knowledge.  (Id. ¶ 95.)

---

[5] The Second Amended Complaint alleges that Moody's defamatory statements were published in an article entitled "Congress Takes On Credit Ratings," which appeared in The Wall Street Journal on September 23, 2009; a September 25, 2009 story published on Bloomberg entitled, "Moody's Probes New Kolchinsky Claims, Says Old Ones Unfounded"; and a September 25, 2009 Wall Street Journal article entitled, "Raters Face Fresh Push in House Over Claims" (collectively the "Articles").  The Articles are annexed to the Declaration of Joseph Nuccio ("Nuccio Decl.") at Exhibits B, C, and D, respectively.

Kolchinsky contends that Moody's knew his claims and recommendations were valid because the company adopted several of his recommendations from the January Emails when it issued its official methodology for rating SF CDOs on March 2, 2009. (Id. ¶¶ 93, 104-106.) In addition, during the House Committee hearings, Richard Cantor, Moody's chief risk officer, testified that Kolchinsky made a policy recommendation that was communicated to Compliance and "[i]t was carefully considered and it was adopted . . . ." (Id. ¶ 101.)

    2.    Failure to Cooperate

Kolchinsky alleges that Moody's issued further statements to the press accusing him of refusing to cooperate with the Kramer Levin investigation. (Id. ¶¶ 114-115.) Specifically, in an article published on October 16, 2009, Moody's told the McClatchy Washington Bureau[6] that "[t]hose [Kramer Levin] investigating lawyers have been given unfettered access to Moody's personnel and documents. Indeed, the only person who has declined to cooperate with the independent investigation is Mr. Kolchinsky." (Id. ¶ 114.) Kolchinsky, however, claims that his "cooperation" began when he submitted the NGFII Memo and that he never refused to cooperate with Kramer Levin. (Id. ¶¶ 116, 121.) Rather, he contends that he "was eager" to cooperate with Moody's and Kramer Levin but that they refused to allow his counsel to be present. (Id. ¶¶ 117, 119.)

    3.    Independent Internal Investigation

Lastly, Kolchinsky asserts that Moody's claimed that the Kramer Levin investigation was "independent" in order to further discredit Kolchinsky. (Id. ¶ 122.) Moody's never disclosed the findings of this investigation, but in responding to questions from the McClatchy Washington Bureau, the company stated that the preliminary findings "are completely consistent with

---

[6] This article is attached to the Nuccio Declaration at Exhibit F.

6

Moody's own compliance review – namely, that Mr. Kolchinsky's claims of misconduct are unfounded." (Id. ¶ 123.)

The Second Amended Complaint also alleges that during Moody's public third quarter 2009 earnings call on October 29, 2009, McDaniel stated that "an external investigation conducted by an independent law firm into various claims about CDOs raised by a former employee has now been completed." (Id. ¶ 124.) Kolchinsky contends that, although McDaniel did not identify him by name, he "could be clearly identified by listeners." (Id. ¶ 125.) Kolchinsky alleges that McDaniel's statements implied that an impartial third party scrutinized his claims and made an undisclosed factual finding. (Id. ¶ 126.) He contends, however, that the investigation was not in fact independent, because Moody's hired Kramer Levin "as a potential defense counsel and an advocate" in the event of a regulatory inquiry. (Id. ¶ 129.)

## DISCUSSION

A.   Motion to Dismiss Standard

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court assumes all facts alleged in the complaint to be true, and draws all reasonable inferences in favor of the plaintiff. Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). Nevertheless, simple chanting of the elements of a cause of action, "supported by mere conclusory statements, do not suffice. . . . While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949-50 (2009). To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face [and] nudge[] [the plaintiff's] claims across the line from conceivable to plausible. . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In deciding a motion to dismiss pursuant to Rule 12(b)(6), this Court may consider

"documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

      B.      Defamation

To state a claim for defamation under New York law, a plaintiff must allege: "(1) that a defamatory statement of fact was made concerning [the plaintiff]; (2) that the defendant published that statement to a third party; (3) that the statement was false; (4) that there exists some degree of fault; (5) and that there are special damages or that the statement is defamatory per se, i.e. it disparaged the plaintiff in the way of his or her office, profession or trade." Ello v. Singh, 531 F. Supp. 2d 552, 575 (S.D.N.Y 2007) (citation and internal quotation omitted). Where the plaintiff is a public figure, a complaint must allege that the defendant made the defamatory statement with actual malice. Karedes v. Ackerley Grp, Inc., 423 F.3d 107, 113 (2d Cir. 2005). Whether particular words are defamatory is a legal matter for the Court to resolve in the first instance. Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 177 (2d Cir. 2000). The Court "must give the disputed language a fair reading in the context of the publication as a whole" and must construe the words "as they would be read and understood by the public to which they are addressed." Id.

The Second Amended Complaint alleges that Moody's and McDaniel's statements to the press and shareholders regarding Kolchinsky constitute defamation *per se*. There is no real dispute that the statements at issue concerned Kolchinsky and that they were published. The statements, however, are not defamatory *per se*. They do not suggest wrongful or illegal conduct as much as they suggest a dispute as to how rating methodologies should be developed,

promulgated, and applied. Kolchinsky believes that Moody's methodologies were incorrect. Moody's assertions to the contrary, however, are not defamatory *per se*.

To constitute defamation *per se*, a statement "must be more than a general reflection upon [the plaintiff's] character or qualities, and must suggest improper performance of his duties or unprofessional conduct." Chiavarelli v. Williams, 681 N.Y.S.2d 276, 277 (N.Y. App. Div. 1st Dep't 1998). See Illiano v. Minneola Union Free School Dist., 585 F. Supp. 2d 341, 356 (E.D.N.Y. 2008) (finding defamation *per se* where defendant told board of education that plaintiff was fired because she "breach[ed] . . . her confidential status as an employee" and sent emails from her work account); Treppel v. Biovail Corp., No. 03 Civ. 3002, 2005 WL 2086339, at *6, 10 (S.D.N.Y. Aug. 30, 2005) (statements that CEO directed company to engage in "illegal" corporate accounting and other fraudulent activities constituted defamation *per se* because they "tend to disparage [counterclaimant] in his position as [CEO]").

Moody's allegedly defamatory statements do not suggest that Kolchinsky was "unfit[] for his professional role," Chiavarelli, 681 N.Y.S.2d at 277, or that he violated Moody's policies or engaged in any illegal activity. Nor do they explain why he was suspended. Both Moody's and McDaniel's alleged defamatory statements indicate only that Kolchinsky did not wish to cooperate with the company's investigation, and that it concluded his claims were unsupported. It was reasonable for Moody's to make these statements in its own defense after Kolchinsky's public testimony against the company. They do not rise to the level of defamation *per se*. Accordingly, the defamation claim is dismissed with prejudice.[7]

---

[7] As Kolchinsky's defamation allegations are equally deficient with respect to McDaniel, the Court need not reach McDaniel's separate argument for dismissal under New York Civil Rights Law § 74.

C.     Sarbanes-Oxley

Section 1514A of Sarbanes-Oxley makes it unlawful for certain employers to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms or conditions of employment because of any lawful act done by the employee . . . to provide information . . . or otherwise assist in an investigation regarding any conduct the employee reasonably believes constitutes a violation" of certain, enumerated federal laws.  18 U.S.C. § 1514A.  To state a claim under Section 1514A, a plaintiff must allege four elements: "(1) that [plaintiff] engaged in protected activity, (2) the employer knew of the protected activity, (3) [plaintiff] suffered an unfavorable personnel action, and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action."  Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006).

The parties do not dispute that the first two elements are satisfied here.  Moody's argues that Kolchinsky fails to allege the third element because he was suspended with pay, and therefore did not suffer adverse employment action.  A plaintiff suffers an adverse employment action when he or she endures "a materially adverse change in the terms and conditions of employment."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation and citation omitted).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  Id.  A plaintiff need not allege termination to state a claim under Section 1514A, however.  See O'Mahony v. Accenture Ltd., 537 F. Supp. 2d 506, 508 (S.D.N.Y. 2008) (Section 1514A claim adequately pleaded where defendant reduced

plaintiff's level of responsibility and compensation shortly after plaintiff reported defendant's alleged fraudulent activity).

Kolchinsky has sufficiently alleged that Moody's took "unfavorable personnel action" against him after he reported what he believed were potential violations of the federal securities laws and SEC rules. He alleges that after his first intervention in September 2007, Moody's excluded him from department meetings, demoted him, and reduced his salary and bonus. (Second Am. Compl. ¶¶ 37-38.) In October 2008, after Kolchinsky objected to a new ABS CDO ratings methodology, Moody's transferred Kolchinsky to a "support" role with no possibility of future promotion. (Id. ¶ 50). Finally, Kolchinsky asserts that he was suspended and constructively terminated on September 3, 2009 after he declined to meet with Kramer Levin without his counsel present. (Id. ¶¶ 66-67.) At the pleading stage, these allegations are sufficient to state a claim under Section 1514A.[8]

D.   Tortious Interference

Kolchinsky asserts that Moody's disseminated allegedly false and defamatory information about him to the public in order to "end his career in the private sector." (Second Am. Compl. ¶ 162.) To state a claim for tortious interference with business relationships and economic advantage under New York law, a plaintiff must allege: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the

---

[8] Even if the alleged acts of retaliation in September 2007 and October 2008 are time barred, as Moody's asserts, Kolchinsky's allegations that Moody's constructively terminated him in September 2009 are sufficient to allege unfavorable personnel action, within the broad remedial language of Section 1514A. Moody's relies on Joseph v. Leavitt, 465, F.3d 87 (2d Cir. 2006), for the proposition that administrative leave with pay is not an adverse employment action. Joseph is distinguishable, however. The Title VII plaintiff in that case was placed on administrative leave after his employer learned that he was using illegal drugs and was accused of domestic violence. Id. at 88-89. The Second Circuit held that because an employer has a right to enforce its preexisting disciplinary policies in a reasonable manner, plaintiff's administrative leave pending resolution of the criminal charges against him did not constitute adverse employment action. Id. at 91. The other authorities relied on by Moody's also involve circumstances where an employee was placed on administrative leave as a result of disciplinary violations or alleged criminal activity. As Kolchinsky alleges that his suspension was in retaliation for engaging in protected activity under Section 1514A, Moody's reliance on these cases is misplaced.

defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008). A complaint must also include a "sufficiently particular allegation of interference with a specific contract or business relationship" of the plaintiff. Envirosource, Inc. v. Horsehead Res. Dev. Co., Inc., No. 95 Civ. 5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) (quoting McGill v. Parker, 582 N.Y.S.2d 91, 95 (N.Y. App. Div. 1st Dep't 1992)). "The defendant's interference must be direct: the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." B&M Linen, Corp. v. Kannegeisser, USA, Corp., 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (internal quotation omitted). Moreover, "[a]s a general rule, the defendant's conduct must amount to a crime or an independent tort" to constitute tortious interference with prospective economic advantage. Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004).

Kolchinsky fails to allege that Moody's interfered with a specific business relationship. Rather, he claims that Moody's alleged acts of defamation maligned his reputation among potential employers "in the financial industry." (Second Am. Compl. ¶¶ 161-162.) This broad allegation does not state a claim for tortious interference with business relationships. See Baker v. Guardian Life Ins. Co. of Am., 785 N.Y.S.2d 437, 438-39 (N.Y. App. Div. 1st Dep't 2004) (affirming dismissal of tortious interference claim where plaintiff failed to "identify any specific employment or business relationship that he was prevented from entering into as a result of defendants' interference"). Moreover, as Moody's statements to the press were not defamatory, Defendants' conduct cannot constitute tortious interference. See Carvel Corp., 3 N.Y.3d at 190.

   E. Intentional Infliction of Emotional Distress

Kolchinsky claims that Moody's alleged retaliation and defamatory statements constitute "extreme and outrageous conduct," and that they were intended to cause him severe emotional distress. (Second Am. Compl. ¶ 167.) To assert a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." Conboy v. AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001). Simply put, the conduct alleged here and taken as true is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993). Courts have found the "extreme and outrageous" requirement satisfied where a plaintiff alleges "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." Stuto v. Fleishman, 164 F.3d 820, 828-29 (2d Cir. 1999) (collecting cases). Kolchinsky's allegations do not have a hint of such conduct. The alleged defamatory statements and retaliation fall well short of the high standard required to plead a claim for the intentional infliction of emotional distress. See Ifill v. United Parcel Serv., No. 04 Civ. 5963, 2005 WL 736151, at *7 (S.D.N.Y. Mar. 29, 2005) (allegations that employer harassed, discriminated, demoted, and retaliated against plaintiff were insufficient to state intentional infliction of emotional distress claim). Kolchinsky's emotional distress claim is therefore dismissed with prejudice.

F.       Declaratory Judgment

Kolchinsky's final cause of action seeks a declaratory judgment that when Moody's made its allegedly defamatory statements against him, the company waived any claim of confidentiality and privilege with respect to Kolchinsky's internal reporting and the Kramer Levin investigation. (Second Am. Compl. ¶ 171.) Moody's argues that under the Second Circuit's ruling in In re von Bulow, 828 F.2d 94 (2d Cir. 1987), extrajudicial disclosure of allegedly privileged information waives only those matters "actually revealed." 828 F.2d at 103.

A court must entertain a declaratory judgment action "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Continental Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992). The declaratory relief Kolchinsky seeks would not end this litigation; rather, his declaratory judgment claim essentially seeks an evidentiary ruling on the admissibility of the internal investigation report. Declaratory relief is not appropriate for that purpose.

Moreover, von Bulow precludes Kolchinsky's claim for a declaratory judgment. In von Bulow, after the defendant was acquitted at trial, his attorney published a book about the case in which he disclosed certain privileged communications with von Bulow's consent. Id. at 96. In subsequent civil litigation, plaintiffs moved to compel discovery of those communications and argued that publication of the book waived the attorney-client privilege. Id. The district court held that under the "fairness doctrine," the undisclosed portions of conversations in the book were discoverable. Id. at 101. The Second Circuit agreed that von Bulow waived the attorney-client privilege, but disagreed with the scope of that waiver. In reversing, the court held that "the extrajudicial disclosure of an attorney-client communication—one not subsequently used by the

client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication." Id. at 102. Thus, although the district court "correctly found a waiver by von Bulow as to the particular matters *actually disclosed* in the book, it was an abuse of discretion to broaden that waiver to include those portions of the four identified conversations which, because they were not published, remain secret." Id.

The same rule applies here. To the extent that Moody's relied on privileged communications with its attorneys when it made statements to the media about Kolchinsky's whistleblower activities, those public statements do not waive privilege with respect to Moody's undisclosed attorney-client communications. See id. Kolchinsky's declaratory judgment claim is therefore dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Moody's and McDaniel's motions to dismiss Kolchinsky's claims for defamation, tortious interference with business advantage, intentional infliction of emotional distress, and declaratory judgment are granted. These claims are dismissed with prejudice for failure to state a claim. The Second Amended Complaint has adequately alleged a violation of the anti-retaliation provision under Sarbanes-Oxley, 18 U.S.C. § 1514A. The Clerk is directed to terminate these motions at Docket Nos. 29 and 31. The parties should meet and confer in the preparation of a Civil Case Management Plan. The parties should agree upon and submit the plan no later than March 19, 2012.

Dated: New York, New York
       February 27, 2012

SO ORDERED

/s/ Paul A. Crotty

PAUL A. CROTTY
United States District Judge